## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Chapter 7 |
| ROBBY J. RING, and | ) | |
| AMY E. RING | ) | Bankruptcy No. 17-01337 |
| | ) | |
| Debtors. | ) | |
| | ) | |

### TRIAL RULING

This matter came before the Court as a trial on a claim objection. Kevin D. Ahrenholz appeared for Debtors, Robby and Amy Ring ("Debtors"). Judith O'Donohoe appeared for the Claimant, Wilford Ring Estate ("the Estate"). The Estate's Proof of Claim #11 was based on "theft" and in the amount of $40,000. On July 31, 2019, the Estate, filed an amendment adding $42,502.11 to its claim, and alleged conversion fraud, breach of a fiduciary duty and confidential relationship, undue influence, and various negligent accounting claims. The Court heard testimony and received evidence. This is a core proceeding under 28 U.S.C. § 157(b)(2)(B).

### STATEMENT OF THE CASE

This claim arises from a conflict between Debtors, Robby and Amy Ring, and Robby's sister, Deanna Fjetland, executor of the estate of Wilford Ring. On October 19, 2017, Robby and Amy Ring filed a Chapter 7 bankruptcy. At that

1

time, Robby Ring was attorney-in-fact for his father Wilford Ring. Robby is the

youngest of Wilford Ring's six children.

Wilford died on January 6, 2018. Sometime after his death, Joseph Braun,

Wilford's attorney notified Deanna Fjetland, executor of the estate, that it appeared

Robby had "misused" some of Wilford's assets. Deanna eventually filed a claim

for theft against this bankruptcy estate seeking to recover the allegedly missing

funds.

Debtors filed an objection to that claim asserting it had no factual or legal

basis. The Court concludes that Debtor's estate owes Wilford Ring's estate the

sum of $5,149.49.

## FINDINGS OF FACT

Robby Ring and his sister Deanna Fjetland had a great relationship until

Wilford Ring died. Robby and Deanna were two of Wilford Ring's six children.

Wilford's other children are as follows: Russell Ring (deceased), Ricky Ring

(deceased), David Ring, and Daniel Ring. David and Daniel had no relationship

with their father years preceding his death and were disinherited along with

Ricky's children.

Wilford's wife, Ilene Ring, preceded him in death. She had handled the

family's finances. After Ilene's death in 2012, David Ring acted as attorney-in-

fact for Wilford and managed the family farm.

2

Unfortunately, David Ring took advantage of Wilford while he was attorney-in-fact from 2012 to 2015. David stole thousands of dollars. He also burned down a shed full of farm equipment worth a half-million dollars. Due to David's betrayal, Wilford was cautious when selecting a new attorney-in-fact.

On November 2, 2015, Wilford approved Robby to act not only as General Power of Attorney, but also as Durable Power of Attorney for his health care decisions. It is notable that Wilford did not choose Deanna for the power of attorney role — nor her husband — even though he had been a financial advisor at IBM for many years.

Robby and his wife Amy live in Osage, Iowa. Wilford Ring lived on the family farm in McIntire, Iowa. Robby and his family were constants in Wilford's life. Robby and his children helped Wilford on the farm. Robby helped him restore cars and an old tractor. Robby, Amy, and their children visited Wilford frequently. Wilford routinely had dinner at Robby and Amy's home. Robby's family visited him almost every weekend and multiple times during the week. In 2012, Wilford moved into a home in Riceville. Wilford Ring moved to home in Riceville because he was unable to keep up with the farm. Deanna lived in Rochester, Minnesota. She only visited her father about two weekends a month.

On January 19, 2017, Wilford had a fall at his home. He laid on the ground alone for almost 24-hours. In those hours, Wilford started to question his future

3

and the role of his remaining family members in his life.  He was hospitalized after

he was found.  Upon his discharge, Robby's family helped move Wilford into

Faith Lutheran Nursing Home in Osage where he lived until his death on January

6, 2018.

While Wilford was in the hospital recovering from his accident, he decided

to change the way his estate would be distributed.  Wilford's original will

bequeathed all of his property to his children in equal shares.   Wilford knew he

wanted his son Robby and Robby's family to benefit more.  He also wanted his

daughter Deanna to receive a bigger share.  Wilford was slightly hesitant about

leaving Deanna in the will — because she had created a wedge between the

siblings — but he ultimately decided to keep her in.

Wilford did not immediately change his will.  Instead, Wilford instructed

Robby to withdraw funds from his accounts and distribute them to Robby and

Deanna — to avoid some probate costs.  He disliked probate fees and wanted to

avoid those fees as much as he could.

On January 27, 2017, Robby transferred $52,161.25 from Wilford's

accounts to the account of Caleb Ring, Robby's son.  The money was deposited

into Caleb's account because Robby and Amy were on the verge of bankruptcy.

Robby then sent Deanna $20,000 from that withdrawal based on Wilford's

directions, so she could receive some of the additional benefits Wilford wanted her to have.

Deanna accepted the $20,000, and still has the cash in her possession. Deanna now claims she does not agree with Robby's recollection of the events. She stated her father never gave gifts and, she "does not believe he would do such a thing." Deanna's statements on this issue are speculation. She was not a party to Robby's conversations with Wilford. In fact, Wilford did not discuss his financial plans with her. Her position also seems to conflict with her actions — as she never tried to return the $20,000, she received.

On May 17, 2017, Wilford officially changed his will to disinherit David Ring, Daniel Ring, and Ricky Ring's children. He named Deanna Fjetland and Robby Ring as his sole beneficiaries. There was no mention of Robby repaying loans or otherwise owing Wilford money when Wilford met his attorney to change the will. There were no suggestions that Wilford had a lack of capacity or was under the undue influence of anyone at that time.

Robby and Deanna both agree that Wilford was careful with his money. Deanna testified that Wilford did not give gifts under any circumstances. She points out that he did not help her daughter when she needed a loan for an expensive custody dispute. Robby testified that Wilford's perspective changed after his fall. He gave gifts not only to Robby and Amy, but also to Deanna's

5

family.  Deanna received $20,000 of the $52,161.25 that Robby withdrew and put

into Caleb's account.  On July 2, 2016, Wilford also allowed Robby to provide a

check for five hundred dollars as a gift to Jessica Fjetland, Deanna's daughter, for

the birth of her daughter.  The Fjetlands also took part in a trip to the Wisconsin

Dells for the whole family, which was paid for by funds from Wilford's account.

Deanna initially tried to claim a refund from Robby for the Dells trip, but now

appears to acknowledge this trip was a gift to her and her children as well.

Deanna was executor of Wilford's estate.  After Wilford's death in January

2018, Deanna looked into Robby's activity as attorney-in-fact for Wilford.  She

became convinced Robby had misused some of Wilford's assets.  Deanna

confronted Robby about the missing assets, and she did not receive—in her

opinion—clarification as to the discrepancies.  Robby stated that the missing funds

were used properly according to his rights as attorney-in-fact.

Deanna admitted she had no knowledge at all about whether Wilford wanted

to help Robby with his financial difficulties.  Deanna acknowledged she rarely

asked her father questions about his finances because when she did, the questions

upset him.  Deanna and her husband testified about their doubts about how Robby

handled things, but neither of them had any knowledge about which transactions

Wilford authorized.

The Court finds most of Robby's testimony to be credible.  The Court rejects Deanna's arguments that Wilford did not authorize any of these transactions. Wilford wanted to help Robby, his youngest child, who also spent the most time with him by far.  Wilford decided to give gifts to family that care for him after his near-death experience.  Robby and Amy's family were not the only ones to benefit from Wilford's gifts.  Deanna's family received gifts for the Wisconsin Dells trip, $20,000 in cash taken from Wilford's account, and the $500 dollars for the birth of Deanna's granddaughter.

Wilford's changes to his will on May 17, 2017, made clear he only wanted to assist his children that were involved in his life.  He apparently also wanted to help Robby's family during difficult financial time and eventual bankruptcy.  The Court also finds that many of the purchases questioned by Deanna were in fact authorized by Wilford under Robby's broad powers as attorney-in-fact.  Many of the challenged transactions were specifically for Wilford's expenses and not for Robby's family.

The Court does agree with Deanna that a few of the expenses did not benefit Wilford at all and probably exceeded Robby's authority under the power of attorney.  The Court finds that a few of the challenged expenses were not authorized and will allow a claim for those amounts.

## CONCLUSIONS OF LAW AND ANALYSIS

Debtors first argue the Court should only examine the original claim —
Claim #11.  Claim #11 alleges "Theft from funds of Wilford Ring while [Robby
was] acting as his Power of Attorney."  Claim #11 never mentioned conversion,
undue influence, or fraud.  Debtors assert transactions that occurred before Robby
had power of attorney should be eliminated because they were not timely raised.
At the hearing, the Court allowed the Estate's amendment, adding over $40,0000
to the original claim.  The Court found sufficient reason for the delay as a result of
the executor finishing her analysis of the accounts.  The Court gave Debtors the
option to postpone the hearing to prepare for the "new" portions of the claim.
Debtors elected to move forward.

### 1.  Statute of Limitations

Debtors next argue that the big parts of the Estate's claim that are based on
tort law, are barred by the statute of limitations.  Deanna first asserts that the Court
not consider the statute of limitation argument because Debtors have made "no
specific pleading of the statute of limitations as an affirmative defense, which is
necessary if it is to be asserted (Rule 1.419)."  Debtors generally agree that the
statute of limitations is an affirmative defense that they must plead — but assert
here that it was impossible to plead an affirmative defense —when the tort
"claims" were made at the last minute.  The Court agrees with Debtors that they

can raise the affirmative defense at the hearing because it was the first notice they

had about tort claims like — "conversion" and fraud.

The Estate made a claim for recovery of the funds which included recovery

of the amounts from loans Deanna says Wilford made to Robby in 2013. Deanna

believes Robby attempted to convert these loans to gifts while he was acting under

the Power of Attorney during the period of July 19, 2016 through January 6, 2018.

The Estate asserts that the proper statute of limitation is five-years under

Iowa Code § 614.1(4) which controls claims for conversion that relate to damage

to property. Debtors believe that the proper limitation period is two-years under

Iowa Code § 614.1(2) which controls claims for conversion that relate to injury to

a person.

The Estate asserts that it has challenged transactions for conversion of

property that fall well within the five-year period. The Estate filed its claim on

April 11, 2019, and all the conduct it challenges arose between July 19, 2016 and

January 6, 2018. Debtors assert the two-year limitation applies and bars a

challenge based on conversion as related tort claims for anything occurring before

August 2017.

"[A] statute of limitations sets forth the time within which an accrued claim

must be asserted in court." Albrecht v. Gen. Motors Corp., 648 N.W.2d 87, 90

(Iowa 2002). Debtors rely on the Iowa Supreme Court's discussion of this issue in

Husker News Co. v. Mahaska State Bank, 460 N.W.2d 476, 477 (Iowa 1990).

Husker News Co. differentiated between the two-year statute of limitations for

conversions that are "injuries to persons" under Iowa Code § 614.1(2) and the five-

year limitations on "injuries to property" under Iowa Code § 614.1(4).  Id.

In that case, Husker News sued the Mahaska State Bank for conversion

through forged endorsements.  Id. at 466.  Mahaska State Bank asserted the claim

was barred by the five-year statute of limitations for injuries to property under

Iowa Code § 614.1(4).  Id. at 467.  The Iowa Supreme Court stated in dicta that:

"because the parties did not contest the matter on appeal, we assume without

deciding that this section applies rather than the two-year limitation for actions

based on 'injuries to person' found in Iowa Code § 614.1(2)."  Id. at n.2.  Debtors

argue the Iowa Supreme Court would not have addressed the issue at all if the five-

year limitation on conversions controlled in all instances.  See Id.

This Court agrees that the five-year statute of limitations may not control in

all instances, but finds that Husker News Co. does not provide any further

guidance to use in this case.  Most Iowa conversion cases apply a five-year statute

of limitations because the injury is to property.  See, e.g., CMI Roadbuilding Inc.

v. Iowa Parts, Inc., 920 F.3d 560, 566 (8th Cir. 2019); Reiff v. Evans, 630 N.W.2d

278,296 (Iowa 2001); see also Estate of Pepper ex rel. Deeble v. Whitehead, 686

F.3d 658, 665-66 (8th Cir. 2012).

10

In <u>Duncan v. Ford Motor Credit Repossessors, Inc.</u>, 919 N.W.2d 768 (Iowa 2018), the Iowa Court of Appeals held the five-year limitation in Iowa Code § 614.1(4) should apply to the conversion claims in that case.  In <u>Duncan</u>, the Court of Appeals found the district court erred in applying the two-year statute of limitations for civil extortion claim.  <u>Id.</u> at 770.  The Iowa Court of Appeals noted that the focus should be on the "actual nature of the action."  <u>Id.</u> (citing <u>Hallett Constr. Co v. Meister</u>, 713 N.W.2d 225, 230 (Iowa 2006)).  Courts must "look beyond the labels to the actual nature of the action" to determine the applicable limitations period. <u>Bob McKiness Excavating & Grading, Inc. v. Morton Bldgs., Inc.</u>, 507 N.W.2d 405, 411 (Iowa 1993); <u>Sandbulte v. Farm Bureau Mut. Ins. Co.</u>, 343 N.W.2d 457, 462 (Iowa 1984) ("It is the nature of the right sued upon and not the elements of relief requested that governs the selection of the appropriate statutory period for the basic right.").

Here, the claim is for Robby's alleged wrongful conversion of Wilford Ring's property.  The actual nature of the claim is an injury to property.  This Court will apply the five-year statute of limitations under Iowa Code § 614.1(4) for causes "founded on unwritten contracts, those brought for injuries to property or for relief on the ground of fraud…"  The statute of limitations does not bar challenge to transactions by Robby Ring while he was attorney-in-fact for Wilford Ring.

11

## 2.   Whether Robby Owes Repayment on Funds Wilford Provided to Him

The Estate asserts two checks from Wilford Ring in 2013, #4830 and #4829,

were loans to Robby which need to be paid back to the estate.  Robby and Amy

disagree and claim those funds were gifts.  They point out Wilford never

demanded repayment and when Wilford visited his attorney Joseph Braun in

November 2015, Wilford did not ask for loan repayment or that his estate reflect a

loan from him to Robby.  Instead, Wilford appointed Robby Ring as his attorney-

in-fact with broad powers.  Two years later, Wilford met again with his attorney,

and demanded no repayment for "loans" as part of his estate.  Instead, Wilford

increased Robby and Deanna's share of his estate at the expense of his other

children.

A gift requires donative intent, delivery, and acceptance by recipient. In re

Marriage of Liebich, 547 N.W.2d 844, 851 (Iowa Ct.App.1996).  The question

here is did Wilford intend the 2013 checks to be gifts or loans. There is a

presumption that less proof is required to prove a gift from a parent to a

child.  Frederick v. Shorman, 259 Iowa 1050, 1057, 147 N.W.2d 478, 483 (1966).

A loan, on the other hand, is a contractual arrangement where a lender transfers

money to a borrower expecting to be paid back in the future.  In re Estate of

Peterson, No. 01-1885, 2002 WL 31017609, at 2 (Iowa Ct. App. Sept. 11, 2002)

(citing Mosebach v. Blythe, 282 N.W.2d 755, 760 (Iowa 1979).  "The intent of the

12

parties, determined by testimony and all surrounding circumstances, is 'of crucial

importance in determining what relationship their conduct gave rise to.'"  Id. at 2.

Whether the check is a loan is a question of fact. Wood Preserving Corp. of

Baltimore v. United States, 347 F.2d 117, 119 (4th Cir. 1965).

Considering all the testimony and the surrounding circumstances in this

case, the Court agrees with Debtors that the 2013 checks were for gifts not loans.

Wilford had many chances to demand repayment of "loans" if that is what he

intended.  Robby frequently visited.  Wilford not only did not ask Robby to repay,

Wilford continued to provide additional money as gifts for Robby and Amy's

family.  Therefore, the Court considers the 2013 checks to be gifts that do not need

to be repaid to the Estate.

3.  **Undue Influence by Robby under the Power of  Attorney and the Burden of Proof**

The Estate asserts the burden of proof is on Robby to prove the transfers the

Estate has questioned during Robby's time acting under the power of attorney were

gifts by Wilford Ring.  The Estate believes Robby needs to prove — because he

was acting for Wilford under a confidential relationship (as attorney-in-fact) —

that he always acted in good faith.  The Estate did not argue there was undue

influence by Robby over Wilford until the hearing on this claim.  Debtors stress the

Court must ignore the claim of undue influence — and the other claims for breach

of fiduciary duty, fraud, improper accounting, and confidential relationship —

because no one raised any of these arguments at any time while Robby was power of attorney, when Wilford changed his wills, or when Deanna's family benefitted from transactions.

Debtors argue Robby can only be liable for breach of a fiduciary duty theory if the Estate shows there was some willful misconduct. The Estate believes that the power of attorney relationship requires Debtors to bear the burden of proof and to show that to each of the questioned transactions were done in good faith.

Deanna, for the Estate, first points to specific paragraphs in the Power of Attorney to support its argument. The Estate still needs to show that Robby failed his duties and that the amount it claims is accurate. See Exhibit 5 sec 4; see also In re Be-Mac Transp. Co., Inc., 83 F.3d 1020, 1028 n.2 (8th Cir. 1996) ("Once an objection is made and the burden of overcoming the claim is met, the ultimate burden of persuasion always rests on the claimant.") (citations omitted). The Estate acknowledges the Power of Attorney gave Robby very broad authority:

    2.   Powers of Attorney-in-Fact.

My Attorney-in-Fact shall have full power and authority to manage and conduct all of my affairs, with full power and authority to exercise or perform any act, power, duty, right or obligation I now have or may hereafter acquire the legal right, power and capacity to exercise or perform. The power and authority of my attorney-in-fact shall include, but not be limited to, the power and authority:

    A. To buy, acquire, obtain, take or hold possession of any property or property rights and to retain such property whether income-producing or non income-producing . . .

14

B. To pay my debts; to borrow money . . .

C. To open, maintain or close accounts, brokerage accounts, savings and checking accounts . . . to write checks, make deposits, make withdrawals and obtain bank statements, passbooks, drafts, money orders, warrants, certificates or vouchers payable to me by any person or entity, including the United States of America

. . .

O. **To make gifts of any of my property or assets to members of my family; and to make gifts to such other persons or religious, educational, scientific, charitable or other nonprofit organizations to whom or which I have an established pattern of giving; provided, however, that my attorney-in-fact may not make gifts of my property to himself or herself. I appoint Robby J. Ring as my attorney-in-fact solely for the purpose of determining if a gift of my property to the attorney-in-fact appointed and acting here under is appropriate and to make any such gifts which are appropriate.**

3.   Construction.

This Power of Attorney is to be construed and interpreted as a general power of attorney. The enumeration of specific items, rights, acts or powers shall not limit or restrict the general and all- inclusive powers that I have granted to my Attorney-in-Fact.

. . .

Exhibit 5 (Emphasis Added)

The Estate, however, points out the power of attorney and the

direction provided under it have limits.  The Estate in particular points out

that the document specifically identifies that there can be liability for Robby:

4.   Liability of Attorney-in-Fact.

15

My attorney-in-fact shall not be liable for any loss sustained through an error of judgement made in good faith, but **shall be liable for willful misconduct or breach of good faith in the performance of any of the provisions of this power of attorney**.

Id. (Emphasis Added).

The Estate also points to additional requirements for the attorney-in-fact: "My attorney-in-fact shall maintain complete and accurate records of all acts performed pursuant to this power of attorney including without limitation, all receipts and disbursements. Upon my request or the request of any conservator appointed on my behalf or the personal representative of my estate, my attorney-in-fact shall allow the inspection of these records and shall provide complete accounting." (Exhibit 5). The Estate claims Robby has not shown he complied with his duties.

"The established rule is that a power of attorney must be strictly construed, and the instrument will be held to grant only those powers which are specified." In re Estate of Crabtree, 550 N.W.2d 168, 170 (Iowa 1996). The Estate notes that there is a confidential relationship and requires Robby to act in good faith and without willful misconduct. A confidential relationship exists "whenever a continuous trust is reposed by one person in the skill and integrity of another." Mendenhall v. Judy, 671 N.W.2d 452, 455 (Iowa 2003) (citation omitted). "The gist of the doctrine of confidential relationship is the presence of a dominant influence under which the act is presumed to have been done." In re

16

Estate of Clark, 357 N.W.2d 34, 37 (Iowa Ct.App. 1984) (citing Oehler v.

Hoffman, 253 Iowa 631, 635, 113 N.W.2d 254, 256 (1962).  "The purpose of the

doctrine is to defeat and correct betrayals of trust and abuses of confidence."  Id.

Here, a confidential relationship existed between Robby and Wilford.  There was a

confidential relationship due to Robby acting as attorney-in-fact for Wilford.

Robby managed all aspects of Wilford's life — especially his finances.

The existence of a confidential relationship can trigger a presumption of

undue influence on some transactions.  In re Estate of Ames, 758 N.W.2d 839

(Iowa Ct. App. 2008).  "Where a confidential relationship is found to exist, and

inter vivos conveyances are challenged, the burden of proof shifts to the benefited

parties to prove—by clear, satisfactory, and convincing evidence—their freedom

from undue influence."  Jackson v. Schrader, 676 N.W.2d 599, 604 (Iowa 2003).

Under the law, the Estate had to show it sufficiently challenged the

conveyances Robby made in his confidential relationship role that benefitted

Robby or his family.  Once it has done this, the burden shifts to Robby to show

there was no undue influence. See Jackson v. Schrader, 676 N.W.2d 599 at 604.

The Court finds that the Estate has sufficiently questioned some of the transactions.

Robby has the burden to establish by clear and convincing evidence that there was

no undue influence over Wilford on those challenged transactions.

Undue influence must be present at the exact time the transfer is

made. Arndt v. Lapel, 214 Iowa 594, 603, 243 N.W. 605, 609 (1932).  To set aside

transactions on the ground of undue influence, there must be "such persuasion as

results in overpowering the will of the [grantor] or prevents him from acting

intelligently, understandingly, and voluntarily—such influence as destroys the free

agency of the grantor and substitutes the will of another person for his

own." Leonard v. Leonard, 12 N.W.2d 899, 903 (Iowa 1944).  According to

Jackson v. Schrader, 676 N.W.2d 599 at 604, four elements must be proven to

rebut the presumption of undue influence: " [T]he grantee must prove (1) the

grantor's lack of susceptibility to undue influence; (2) the want of opportunity to

exercise such influence and effect the wrongful purpose; (3) the lack of a

disposition to influence unduly for the purpose of procuring [an] improper favor;

and (4) a result clearly unaffected by undue influence."  See also In re Estate of

Todd, 585 N.W.2d 273 (Iowa 1998).  Robby must satisfy all four elements with

clear and convincing evidence.

A.  Lack of Susceptibility to Undue Influence

Wilford was elderly and in a nursing home during many of the questioned

transactions, but Wilford was always of sound mind.  There were no accusations of

undue influence when Wilford selected Robby as his attorney-in-fact on November

2015.  Similarly, there were no such accusations when Wilford changed his will on

May 17, 2017.  The only evidence offered at all is that Wilford directed Robby to

make the same gifts that Deanna found to be questionable.

There is no evidence Wilford was susceptible to undue influence.  Robby

has established that the opposite is true.  Wilford carefully considered with his

attorney Joseph Braun, who to select as attorney-in-fact after his son David abused

his position.  Wilford trusted Robby.  Wilford never made any statements about

Robby's handling of affairs.  Wilford had no complaints when he went back to the

same attorney to increase Robby and Deanna's shares in the estate cutting out his

other children.  Without any evidence to counter this, the Court believes Robby has

clearly shown Wilford was not susceptible to undue influence.

B.  Opportunity to Exercise Undue Influence.

As attorney-in-fact, Deanna points out Robby had an opportunity to exercise

some influence over Wilford's affairs.  The provisions of the Power of Attorney

did not give Robby unbridled power.  Wilford gave the directions to his attorney

on the scope of the Power of Attorney.  Wilford was in the room alone with his

attorney when he prepared and executed the documents.  Robby had no

opportunity to push Wilford to prepare the document the way he did.  While there

was a chance or theoretical opportunity to exercise undue influence at some point,

Robby testified in a clear and convincing manner that Wilford directed Robby's

approach to transactions and that payments should be made to benefit to Robby
and Deanna.

    C.  <u>Disposition to Use Undue Influence</u>.

    Robby showed convincingly that he and his family were disposed to support
Wilford and see his wishes were carried out — not to take advantage of him.
Robby showed he and his family spent time with Wilford out of love — not to get
his money.  Robby and his wife showed quite clearly that they had no disposition
to unduly influence Wilford.  Again, the suspicion of Deanna and her husband do
not provide any evidence that calls Robby's testimony into question.

    D.  <u>Result Appears to be Unaffected by Undue Influence</u>

    The evidence also convincingly showed Robby exercised no undue influence
at all.  Wilford had independent legal advice when appointing Robby as attorney-
in-fact.  Wilford granted Robby broad powers.  After the unfortunate events with
David, Wilford and his attorney were on heightened awareness to protect Wilford's
interests.  Robby was aware of all of this and pursued his duties to Wilford.  Robby
proved that he did not pursue his own agenda — but instead implemented
Wilford's wishes.

    The Estate cites <u>Miller v. Eisentrager</u>, 779 N.W.2d 79 (Iowa Ct. App. 2009).
There, a daughter's vague and vacillating testimony was insufficient to rebut the
presumption of undue influence on her father.  Here, Robby provided consistent

and specific testimony about how he acted on Wilford's wishes.  The evidence also showed that Wilford wanted Robby to have broad discretion — and drew up the power of attorney to reflect this.  See Id.  Wilford wanted Robby to gift assets to himself and his family and specifically gave Robby discretion to do just that.  Defendant in Miller was not allowed to give gifts to herself and had strictly confined powers as attorney-in-fact.  Id. at 4.

The Estate also argues that Wilford was competent until December 2017, and thus there was no reason for Robby to sign the checks or implement anything until Wilford lost competence.  This is not for the Court to decide.  Wilford gave Robby those rights and responsibilities as attorney-in-fact to write checks implementing Wilford's wishes and make some judgments on Wilford's behalf.  Robby assisted Wilford in many aspects of his life and showed that he and his wife were acting out of love for Wilford and doing what they could for him.

The Estate asserts Robby failed to prove that all of the transactions were in good faith and in accordance with Wilford's wishes.  This Court disagrees and finds most of these gifts were made at Wilford's specific direction.  Robby assisted Wilford in a way that carried out Wilford's wishes.  Robby showed with clear and convincing evidence that transactions were made in good faith.

 The Court does find, however, that Robby failed to show he properly carried out his fiduciary duties on a couple occasions.  The Court does not believe the

evidence showed Robby willfully disregarded Wilford's wishes in any major way,

but the Court finds Robby did not satisfy his burden of proving a few specific

transactions were appropriate.

The Court thus finds and concludes there are some discrepancies in Robby's

exercise of duties, but not nearly as many as the Estate's claim asserts.  The Court

reviewed all transactions and split them into 3 categories: (1) transactions

benefitting Wilford, (2) gifts authorized by Wilford, and (3) unauthorized

transactions due back to the estate.  The Court's findings are as follows:

1. **Transactions Benefitting Wilford**

| | | |
|---|---|---|
| Mills Fleet Farm: | 10/18/2016 | $151.88 |
| O'Reilly's Fuel Pump/Chem | 11/06/16 | $261.33 |
| Farm Saw | 5/18/17 | $564.68 |
| Mills Fleet Farm | 5/23/17 | $386.49 |
| Mills Fleet Farm | 6/06/17 | $623.18 |
| County Treasurer (Plates for (Wilford's Truck | 6/06/17 | $105.00 |
| O'Reilly's | 12/31/17 | $105.91 |
| Theisen's | 12/31/17 | $221.64 |
| Mills Fleet Farm | 1/03/18 | $125.32 |
| Dish Network | 1/30/17 | $439.75 |
| **Total:** | | **$2,985.38** |

2. **Gifts Authorized by Wilford**
   a. $5500 to Robby                                    2013
   b. $500 to Caleb                                     2013
   c. $52,161.25 withdrawn from Wilford's accounts   1/27/17
   d. $1,550 Thrivent Cash Withdrawal                12/12/17
   e. $900 paid to Amy                                9/5/17
   f. $460 paid to Amy                                10/16/17
   g. $3,900 paid to Caleb                            11/8/17
   h. $450 paid to Amy                                11/19/17

     i.  $64.00 to Casey's General Store       1/4/17

     j.  BP Visa Charges:  $6,228.53       4/2017-1/2018

         i.  Gas/Home/Farm Supplies

     **Total:**          **$71,713.78**

3. **Unauthorized Transactions Owed to Wilford's Estate**

    a.  BP Visa Charges

| | | | |
|---|---|---|---|
| i. | Best Buy | 4/02/17 | $414.09 |
| ii. | Amazon | 5/3/17-11/4/17 | $2,137.04 |
| iii. | American Eagle | 9/23/17 | $34.94 |
| iv. | Michael Kors | 11/07/17 | $208.60 |
| v. | Paypal | 7/23/17-11/16/17 | $646.91 |
| vi. | Overton's | 10/09/17 | $133.98 |
| | Total: | | $3,575.56 |

    b.  Costco Check     1/08/17     $715.93

       (Robby's Tires)

    c.  Check paid to Robby   1/3/18      $600.00

    d.  Check paid to Robby   1/6/18      $250.00

    **Overall Total:**          **$5,141.49**

When examining the transactions benefitting Wilford in Category 1, the Court found under evidence that these transactions personally benefitted Wilford. The transactions benefitted Wilford's home, farm, and Wilford personally. Dish Network benefitted Wilford. It was set up at his home and farmhouse where he lived alone. The fact it was likely not turned off immediately when Wilford moved into the nursing home, standing alone, does not show it was done for Robby or in bad faith.

Other transactions were proven to be items for Wilford's farm. The farm saw was for Wilford's farm. Furthermore, the O'Reilly's, Theisen's, and Mill's

Fleet Farm charges were for items related to the farm and vehicles that Wilford enjoyed tending to.  Robby had the power to purchase these items to benefit Wilford's farm as attorney-in-fact, and to implement Wilford's wishes to continue to care for items even after he moved to the nursing home.

The evidence shows quite clearly that Wilford Ring changed his approach to his finances after his fall.  Wilford's near-death experience was a point in time Wilford decided he wanted Robby and Deanna to benefit from his estate.  He decided that because they were the only two that showed him any love and support. He increased Robby's share in his estate.  Simply stated, Wilford decided he wanted only Robby and Deanna's families to benefit from his estate.  Deanna did not decline $20,000 of benefit from Wilford's accounts.  She accepted the $20,000 and did not inquire why her father had Robby sent it, or why it was being sent.

The checks that went to Amy and Caleb Ring in late 2017 were during the time Robby and Amy were preparing to file for bankruptcy.  Wilford had tried to help prevent them from filing for bankruptcy but continued to help when that was not possible.  The BP Credit Card purchases were mostly — but not entirely —to help Robby and his family.  Robby was overzealous with a few BP credit card

purchases that exceeded his authority as attorney-in-fact and were not authorized

by Wilford.  Those are covered in Category 3 — unauthorized transactions.

The unauthorized transactions (Category 3) were mostly BP Credit Card

purchases.  Robby did not show these transactions intended to benefit Wilford or

help Robby's family finances.  Designer brand purchases, like the Michael Kors

purse, do not help a family struggling financially.  Robby also failed to clearly

explain why he charged tires for his Suburban.  These were not purchased when

money was tight.  Robby also wrote a couple checks to himself while Wilford was

on his death bed.  Robby crossed out a date on one check, changing it to be days

before Wilford's death.  Neither Robby nor Amy had answers about why these

checks were written so close to Wilford's death.  They also had provided no

explanation why the date on the check was changed.  The Court finds the

convenient timing, and indirect answers did not satisfy Robby's burden of proof.

On these items, Robby exceeded his authority as attorney-in-fact and/or exercised

under influence over Wilford with his finances.

The Court concludes Debtors proved Wilford wanted to help them with their

financial troubles, and that most transactions at issue were due for these purposes.

However, Robby did not have free reign, even under the broad Power of Attorney.

The Court finds that Robby incurred **$5,141.49** in charges against the Wilford Ring

Estate that were not authorized or completed in good faith.

## CONCLUSION

**WHEREFORE**, the claim of the Wilford Ring Estate is granted in part and

denied in part.

**FURTHER**, Debtors Robby and Amy Ring are ordered to pay the claim of

the Wilford Ring Estate in the amount of **$5,141.49**.

Dated and Entered:

April 9, 2020

_____
THAD J. COLLINS
CHIEF BANKRUPTCY JUDGE